NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 06a0380n.06
Filed: May 30, 2006

No. 05-5291

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

SALT LICK BANCORP., et al.,                )
                                           )      ON APPEAL FROM THE
    Plaintiffs-Appellants,                 )      UNITED STATES DISTRICT
                                           )      COURT FOR THE EASTERN
        v.                                 )      DISTRICT OF KENTUCKY
                                           )
FEDERAL DEPOSIT INSURANCE CORP., et al.,   )
                                           )
    Defendants-Appellees.                  )
                                           )
_____ )

BEFORE:  BOGGS, Chief Judge; BATCHELDER, Circuit Judge; and KATZ, District Judge.[*]

**KATZ, D.J.**  Plaintiffs-Appellants ("Appellants") are the former holding company and the

former President and CEO of Salt Lick Deposit Bank ("the Bank").  Appellants brought suit against

the Federal Deposit Insurance Corporation ("FDIC"); four FDIC employees in their personal

capacities ("the FDIC Employees"); the Kentucky Department of Financial Institutions ("KDFI");

four KDFI employees in their personal capacities ("the KDFI Employees"); APS Financial

Corporation; an APS employee named Ray Mastroleo; and David Scott, the Bank's former Chief

Financial Officer.  The six-count complaint essentially alleges that the actions of the FDIC, the

_____

[*]The Honorable David A. Katz, United States District Judge for the Northern District of
Ohio, sitting by designation.

KDFI, and their individually sued employees caused Salt Lick Bancorp to sell the Bank for less than full value; that APS, Mastroleo, and Scott defrauded the Bank by arranging for it to buy nearly worthless industrial development bonds, causing it to become "critically undercapitalized"; and that the FDIC and the KDFI failed to spot the fraud and report it to the Bank in a timely fashion.

Appellants appeal from the district court's final judgment dismissing the case. They seek review of a series of prior orders and opinions that dismissed claims and parties, eventually whittling their case down to nothing. We affirm the rulings and the judgment of the district court.

## I. Factual Background

Salt Lick Bancorp, Inc., is the former holding-company parent of Salt Lick Deposit Bank, a small bank in Eastern Kentucky. John D. Hughes, Jr., a Salt Lick Bancorp shareholder, is the Bank's former President and CEO. Hughes, an attorney, represents himself and Salt Lick Bancorp in this litigation.

The factual record in this case consists primarily of the sworn declarations of the individually sued government employees; Appellant Hughes's "Sworn Verification of Factual Statement," which is comprised solely of an incorporation by reference of the "Factual Statement" portion of Appellants' December 28, 2001, "Memorandum Opposing Defendant's Motion to Dismiss or for Summary Judgment"; and the Affidavit of John D. Hughes, Jr., which purports to adopt, under oath, again, the same factual "testimony" from the December 28, 2001 memorandum. Hughes's deposition was taken; however, as Hughes himself asserts, under the mistaken apprehension that it helps his case, he never made the full deposition part of the record below. The content of

Appellants' "factual statement" will be discussed below. In the meantime, the sworn statements of the FDIC Employees provide some relevant background information.

Salt Lick Deposit Bank was formed in 1901. In 1999, Salt Lick Bancorp was formed as a one-bank holding company, with its primary asset being 100% of the Bank's outstanding shares. John D. Hughes, Jr., owned eighty percent of Salt Lick Bancorp; Paula R. Hughes owned one percent; Naomi C. Shrout owned nineteen percent. When Salt Lick Bancorp was formed, Central Bank & Trust Company of Lexington, Kentucky, loaned it what Defendant-Appellee Cottrell Webster, the FDIC's Regional Memphis Director, called a "substantial" sum of money.

On March 1, 2001, the FDIC and the KDFI began a joint "Safety and Soundness" examination of the Bank. According to Webster, the Bank had learned from independent consultants prior to this investigation that its bond portfolio had undergone significant losses. The FDIC and KDFI investigators made a similar finding. They concluded that the Bank's capital level was below 2 percent of total assets, meaning it was "Critically Undercapitalized" under applicable federal regulations, which required the FDIC to appoint a receiver within ninety days.

After reviewing the findings with other FDIC officials, Webster, as FDIC Regional Director, issued a "Prompt Corrective Action Directive" on April 17, 2001, requiring the Bank to develop a plan to achieve a capital ratio of 4 percent within twenty-one days. The Bank appealed on April 30, 2001, and the FDIC began considering the appeal. On April 27, 2001, the Bank held a board of directors meeting at the FDIC's Lexington Field Office. According to Webster, during this meeting four directors, including John D. Hughes, Jr., approached the FDIC and the KDFI with a plan to sell

3

the Bank to its largest creditor, Central Bancshares, the parent of Central Bank & Trust Company. On May 9, 2001, Salt Lick Bancorp sold the Bank to Central Bancshares. Thereafter, the Bank withdrew its appeal of the FDIC's Prompt Corrective Action Directive.

In his "Factual Statement," Hughes states that the Bank purchased the problematic bonds between 1998 and 2000 and disclosed them on its books and quarterly call reports as municipal revenue bonds, but that the Bank discovered in August of 2000 that they were in fact industrial development bonds. (Industrial development bonds are not backed by the credit of the issuing political entity, but generally by the credit of the industry for whose benefit they are issued). He claims the Bank's estimates of its bond losses were far lower than the FDIC concluded. Further, the Bank estimated its tangible equity at over 4 percent, as opposed to below 2 percent, if both bond losses and loan losses were accounted for. The Bank had developed and filed with the FDIC on February 8, 2001, its own Safety and Soundness Compliance Plan to remedy the problems with its bond portfolio. Although Hughes alleges the FDIC violated its own asset classification and securities appraisal policy when it reviewed the Bank's bond holdings, and misrepresented facts about the bond portfolio, he does not explain in what ways the violations and misrepresentations occurred.

Hughes points out that the plan to sell the Bank to Central Bancshares was presented to the FDIC as a potential "last resort," and that the Bank had hired a broker to find a buyer other than Central Bancshares. Hughes also describes a known "personality conflict" between himself and the FDIC's Examiner-in-Charge, Defendant-Appellee Charles Vice. He claims the FDIC's Prompt

Corrective Action Directive would have required the Bank to maintain Tier I capital greater than 7.5 percent, but the FDIC has never required the Bank's new owners to maintain more than 5.9 percent.

Finally, Hughes makes several unsupported allegations, including that the FDIC pressured Central Bancshares to "strong-arm" Salt Lick Bancorp into selling to Central Bancshares, that it precluded other potential bidders from conducting due diligence investigations, and that it led Central Bancshares to believe it would not allow Hughes "back into the banking industry as a competitor," causing Central Bancshares to withdraw an offer of employment to Hughes.

The Complaint, which the district court described as "various legal conclusions supported by few specified facts," sets forth six counts. Count I alleges the FDIC and the KDFI "unconstitutionally deprived the Plaintiffs herein of their property, namely Salt Lick Deposit Bank . . . and their ability to remain involved in the banking industry, without due process of law, and effectively took same from them without fair and adequate compensation or a reasonable opportunity to obtain same." Count II alleges the FDIC "improperly failed to perform the discretionary function of open-bank assistance as permitted under 12 U.S.C. § 1823(c)." Count III alleges the FDIC Employees and the KDFI Employees acted beyond the scope of their authority "by misrepresenting facts, being deceitful, violating their own policies, and unconstitutionally discriminating against the Plaintiffs herein" and thereby "did wilfully, recklessly, negligently, [or] intentionally" damage the Plaintiffs and intentionally inflict emotional distress upon Hughes. Count IV alleges APS and its employee Mastroleo defrauded Appellants by selling the Bank industrial development bonds at inflated prices while buying municipal revenue bonds from the Bank at

market rates. Count V alleges the Bank's former Chief Financial Officer, David Scott, aided and abetted APS and Mastroleo in selling the overpriced bonds to the Bank. Count VI alleges the FDIC and the KDFI "willfully, recklessly, intentionally and/or negligently" damaged Plaintiffs by not disclosing to the Bank that the industrial revenue bonds were on its books and were not being reported properly, and by failing to refer the fraud to the FBI and the United States Attorney's Office under 12 U.S.C. §§ 1818 and 1819.

## II. Procedural Background

The procedural history of this lawsuit is rather protracted. On April 23, 2002, the district court issued an order granting the FDIC's motion to dismiss the counts against it (Counts I, II, and VI) for failure to state a claim on which relief could be granted. Though it found the FDIC was not immune to suit, and the Federal Tort Claims Act ("FTCA") was not Appellants' "exclusive remedy," the court determined that each claim against the FDIC warranted dismissal. The court construed Count I as an attempt to bring a *Bivens* action against a federal agency, which the Supreme Court has forbidden. It found there was no implied private right of action that could support the Count II claim for failure to offer open-bank assistance under 12 U.S.C. § 1823(c). Finally, it found the FDIC had no duty to inform the Bank of wrongs discovered in its investigations, as alleged in Count VI.

In the same order, the court granted the motion of APS and Mastroleo to compel arbitration, based on an arbitration clause in the "Account Agreement" between APS and the Bank. Finally, the court denied the motion to dismiss filed by the FDIC Employees. The court found the claims against those Defendants to be "immutably torts in state common-law clothes," not constitutional claims as

6

argued by the Defendants. It erroneously concluded the claims were properly before it, an error it would later correct.

In an order dated May 17, 2002, the district court noted the certification by the Attorney General's designee that the FDIC Employees were acting within the scope of their employment during the incidents giving rise to the suit, and dismissed the claims against those Defendants, substituting the United States in their place under Section 6 of the Federal Employees Liability Reform and Tort Compensation Act of 1988, 28 U.S.C. § 2679(d)(1).

On Appellants' motion for reconsideration, the district court issued, on August 22, 2002, an order clarifying that it erred when it denied the FDIC Employees' motion to dismiss. The court reasoned that because the United States attorney had certified that the Employees acted within the scope of their employment, they were entitled to blanket, absolute immunity under the FTCA, and the claims against them were properly dismissed. The court additionally dismissed the claims against the United States as substituted in the place of the FDIC Employees, because the FTCA exempts from the United States' waiver of sovereign immunity actions for deceit and misrepresentation.

In an order dated November 13, 2002, the district court disposed of several pending motions. It first summarily denied Appellants' motion for "revision" of its August 22, 2002, order ruling on Appellants' motions for reconsideration. It then granted the KDFI's motion to dismiss, finding that, as a state agency performing a governmental function, the KDFI was immune from tort liability. Then, noting that the KDFI Employees were immune from suit if their acts involved the exercise of

discretion, in good faith, within the scope of their authority, the court found the first and last criteria were met, but denied the Employees' motion to dismiss so Appellants could conduct discovery on the issue of bad faith. The court noted that the only remaining claims were the Count III claims against the KDFI Employees and the Count V claim against former CFO David Scott.

By December 2, 2002, Appellants had moved the district court to reconsider its April 23, 2002, order dismissing the FDIC, to reconsider its August 22, 2002, order dismissing the FDIC Employees, and to reinstate the FDIC as a Defendant. The court denied all of the motions and warned Appellants that any further requests for reconsideration of those orders would result in sanctions.

On October 2, 2003, the district court granted the KDFI Employees' motion for summary judgment, finding Appellants had failed to bring forth any admissible evidence, as opposed to mere conclusory allegations, showing the Employees acted in bad faith. David Scott was then the sole remaining defendant.

On October 21, 2003, in response to a status report filed by Scott stating that Appellants had taken no discovery with respect to their claims against him, the district court instructed Appellants to show cause why their claims against Scott should not be dismissed for failure to prosecute. On November 5, 2003, Appellants moved to hold the claims in abeyance pending the arbitration proceedings with APS and Mastroleo. The court granted the motion on November 18, 2003, striking the case from its active docket and requiring a status report within ten days of the conclusion of the arbitration. Nearly a year later, on November 12, 2004, Scott informed the district court that

Appellants had thus far taken no action to commence arbitration proceedings against APS and

Mastroleo. Scott moved to dismiss the claims against him, citing his difficulty in obtaining a home

loan and a securities registration due to the pendency of Appellants' lawsuit. Appellants responded

that they had been unable to obtain counsel and that Central Bancshares had not cooperated with

their attempts to obtain necessary records, but that they had every intention of pursuing the

arbitration. On December 14, 2004, the district court granted Scott's motion to dismiss for failure

to prosecute. In a separate order also filed on December 14, 2004, the district court issued a final

judgment dismissing the action and striking it from the docket.

### III. Discussion

Appellants challenge the district court's: (1) dismissal of the FDIC; (2) failure to reinstate

the FDIC as a defendant; (3) substitution of the United States for the FDIC Employees; (4) dismissal

of the United States; (5) dismissal of the KDFI; (6) grant of summary judgment in favor of the KDFI

Employees; (7) order compelling arbitration; and (8) dismissal of Scott for failure to prosecute.[1] We

affirm the decisions of the district court on all eight issues.

---

[1]In their Notice of Appeal, timely filed on February 11, 2005, Appellants seek review of:
(1) the portion of the April 23, 2002, order that "dismisses the [FDIC] (as an agency) from this
lawsuit"; (2) the May 17, 2002, order substituting the United States for the FDIC Employees; (3)
the August 22, 2002, memorandum opinion and order dismissing the United States and the FDIC
Employees; (4) the portion of the November 13, 2002, memorandum opinion and order that
"dismisses the [KDFI] (as an agency) from this lawsuit"; (5) the December 2, 2002, order
denying Appellants' motions for consideration, and threatening sanctions; (6) the October 2,
2003, memorandum opinion and order granting summary judgment in favor of the KDFI
Employees; (7) the December 14, 2004, order granting David Scott's motion to dismiss for
failure to prosecute; and (8) the December 14, 2004, judgment dismissing the case.

## A. **Dismissal of the FDIC**

In its April 23, 2002, order, the district court dismissed Appellants' Count I Fifth Amendment claim against the FDIC because the Supreme Court has held that there is no avenue by which a plaintiff may bring a constitutional tort claim against a federal agency. The court dismissed Count II because it found no implied private right of action under 12 U.S.C. § 1823. It dismissed the Count VI claim against the FDIC because it found the FDIC had no duty to inform a bank of wrongs discovered in the course of its investigations. Though they claim the district court improperly dismissed the FDIC as a party, Appellants present specific argument only as to Count II. However, upon *de novo* review, as required in this appeal, *Memphis, Tenn. Area Local, Am. Postal Workers Union v. City of Memphis*, 361 F.3d 898, 902 (6th Cir. 2004), we hold that all of Appellants' claims against the FDIC were properly dismissed by the district court for failure to state a claim upon which relief can be granted.

### 1. **Count I - Deprivation of Fifth Amendment Rights**

Count I alleges that the FDIC deprived Appellants of their Fifth Amendment due process rights. The district court correctly concluded that, despite the failure of the Federal Tort Claims Act to preclude a constitutional tort action against the FDIC in its own name, and the FDIC's waiver of its sovereign immunity as to such claims, the substantive law on which Appellants rely provides no avenue for relief. *FDIC v. Meyer*, 510 U.S. 471, 475-86 (1994). In other words, a *Bivens* claim may not be brought against a federal agency. *Id*. at 485-86.

In *Meyer*, the Federal Savings and Loan Insurance Corporation ("FSLIC") had been

appointed as receiver for a savings and loan. *Id*. at 473. In that capacity, the FSLIC terminated the entity's senior managers. *Id*. One of them, Meyer, sued the FSLIC, claiming its termination of his employment deprived him of a property right without due process of law, in violation of the Fifth Amendment. *Id*. at 473-74. Like the FDIC, the FSLIC was able to "sue and be sued." *Id*. at 475; 12 U.S.C. § 1725(c)(4) (repealed 1989).

The Supreme Court explained that, when several criteria are met, including the requirement that "the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred," *id*. at 477 (quoting 28 U.S.C. § 1346(b)), the remedy provided by the FTCA (a lawsuit against the United States) is "exclusive," which means that, in such cases, "the federal agency cannot be sued 'in its own name,' despite the existence of a sue-and-be-sued clause," *id*. at 476. Therefore, the Supreme Court concluded, the FTCA does not preclude a plaintiff from bringing a federal constitutional tort claim against a federal agency in its own name. *Meyer*, 510 U.S. at 477-78. The Court then held the FSLIC's "sue-and-be-sued" clause waived its sovereign immunity for constitutional tort claims. *Id*. at 483.

The *Meyer* Court next turned to the "second inquiry," i.e., "whether the source of substantive law upon which the claimant relies provides an avenue for relief." *Id*. at 483-84. Under *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971), persons injured by a federal agent's constitutional tort may sue the agent for damages. *Bivens*, 403 U.S. at 389. However, in *Meyer*, the Supreme Court refused to extend *Bivens* to authorize suits against federal *agencies* themselves, holding that the logic of *Bivens*, which approved suits against federal *agents*

11

in part *because of* the lack of a remedy against federal agencies, did not support such an extension.

*Meyer*, 510 U.S. at 483-86. The Court held that a plaintiff may not bring a constitutional tort claim

against a federal agency. *Id.*

Appellants' claim against the FDIC, like Meyer's claim against the FSLIC, alleges a

deprivation of property without due process of law, a constitutional tort. Under *Meyer*, Appellants

may not bring such a claim against the FDIC, a federal agency. The district court therefore properly

dismissed Appellants' Count I claim against the FDIC.

### 2. Count II - Failure to Perform Discretionary Function Under 12 U.S.C. § 1823

Count II alleges that the FDIC "improperly failed to exercise and perform the discretionary

function of open-bank assistance as permitted under 12 U.S.C. § 1823(c)." The district court

dismissed the claim because it found no implied private right of action. Appellants do not address

the right of action issue, instead arguing in their brief:

> The provision of the Federal Tort Claims Act that it (the FTCA) is the exclusive
> remedy for most torts committed by federal agencies does not apply to any claim
> based upon the failure by a federal agency to exercise or perform a discretionary
> function; and accordingly, the same is actionable outside the FTCA . . . .

This claim is based on a misreading of 28 U.S.C. § 2680, *see* Section III.D, *infra*, and, in any event,

Appellants have failed to demonstrate that Congress intended for them to have a private right of

action to claim the FDIC failed to perform its discretionary functions under 12 U.S.C. § 1823(c),

which provides:

> The [FDIC] is authorized, in its sole discretion and upon such terms and conditions
> as the Board of Directors may prescribe, to make loans to, to make deposits in, to
> purchase the assets or securities of, to assume the liabilities of, or to make

contributions to, any insured depository institution [under certain specified conditions].

12 U.S.C. § 1823(c).

As the district court noted, Appellants' claim depends on the unstated assumption that an implied private right of action exists under § 1823(c)(1). The four factors considered when determining whether an implied private right of action exists are:

> First, is the plaintiff "one of the class for whose especial benefit the statute was enacted," - that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?

*Cort v. Ash*, 422 U.S. 66, 78 (1975) (internal citations omitted); *Care Choices HMO v. Engstrom*, 330 F.3d 786, 788-89 (6th Cir. 2003). "The 'central inquiry' is 'whether Congress intended to create, either expressly or by implication, a private cause of action.' The Supreme Court has admonished, however, that implying a private right of action 'is a hazardous enterprise, at best.'" *Care Choices HMO*, 330 F.3d at 789 (quoting *Touche Ross & Co. v. Redington*, 442 U.S. 560, 575 (1979)).

This court does not "infer the existence of private rights of action haphazardly. . . . [T]he recognition of a private right of action requires affirmative evidence of congressional intent in the language and purpose of the statute or in its legislative history." *Pertuso v. Ford Motor Credit Co.*, 233 F.3d 417, 421 (6th Cir. 2000) (citation omitted). "For a statute to create . . . private rights, its

text must be 'phrased in terms of the persons benefitted.'" *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284 (2002) (quoting *Cannon v. Univ. of Chicago*, 441 U.S. 677, 692 n.13 (1979)). Such phrasing is exemplified by 42 U.S.C. § 2000d, which provides "no person in the United States shall . . . be subjected to discrimination . . . ." *Id.* "Where a statute does not include this sort of explicit 'right- or duty-creating language,' [courts] rarely impute to Congress an intent to create a private right of action." *Gonzaga Univ.*, 536 U.S. at 284 n.3.

Appellants have identified nothing in the statute's language or legislative history indicating that Congress intended to create a private right of action. Indeed, Congress' authorization to the FDIC to act in its "sole discretion and upon such terms and conditions as the Board of Directors may prescribe" counsels against such a finding. Moreover, the statute is phrased in terms of an authorization of power to the FDIC, not in terms of the entity purported to be benefitted. It lacks the sort of "right or duty creating language" that demonstrates a congressional intent to create a private right of action. For these reasons, the district court properly dismissed Appellants' Count II claims.

### 3. Count VI - Failure to Disclose Examination Findings

Count VI complains that the FDIC failed to inform the Bank of its investigation findings, and failed to inform the FBI and the U.S. Attorney's Office about alleged fraud involving the Bank's bond portfolio. Citing the legislative history of the Federal Deposit Insurance Act, the Third Circuit has held that:

> The purpose of the bank examinations by the FDIC under 12 U.S.C. § 1820(b) is to prevent losses that would result in claims against the insurance fund. Nothing in the

> Act purports to establish any duty requiring that the FDIC warn banks of irregularities perpetrated by their officials. When the FDIC carried out its responsibilities under the Act by examining the Bank, its purpose was to safeguard this system of insurance, and not as the plaintiff contends, to fulfill an obligation to notify the insured bank of any unlawful banking practice of bank officials.
>
> The FDIC was not acting for the benefit of the Bank or even of the Bank's depositors and other creditors. If bank examinations by the FDIC reveal any irregularities or fraud, such examinations, though they may inure incidentally to the benefit of a bank, are intended primarily for the protection of the insurance fund.

*First State Bank v. United States*, 599 F.2d 558, 563 (3d Cir. 1979) (footnote omitted) (citing, *inter alia*, S. Rep. No. 86-1821 (1960), *as reprinted in* 1960 U.S.C.C.A.N. 3234, 3236 (a Senate Report relating to an amendment to the Act, and observing that the FDIC's "supervisory responsibilities relate to specific types of actions which have a direct bearing upon its role as insurer")). The Third Circuit concluded:

> [T]he Federal Deposit Insurance Act imposes no duty on the FDIC to warn the officers and directors of a bank about wrongdoing committed by one of its officials and discovered by the FDIC. The duty to discover fraud in their institutions is upon bank directors and they may not transfer it to the FDIC by the easy expedient of purchasing insurance protection from it.

*Id*. at 563.

Concurring with the Third Circuit's sound reasoning, we find that the district court's dismissal of Count VI against the FDIC was proper.

**B. <u>Failure to Reinstate the FDIC as a Defendant</u>**

After the district court issued its August 22, 2002, memorandum opinion and order holding that claims for misrepresentation and deceit were exempted from the FDIC's waiver of sovereign immunity, the FDIC informed Appellants that it believed the April 22, 2002, opinion barred the

administrative claim Appellants had filed against it. Utilizing an ill-conceived argument that entirely neglected to account for the reasons (discussed above) that the district court had dismissed the claims against the FDIC in the first place, Appellants then moved under Federal Rule of Civil Procedure 60(b)(6) to reinstate their claims against the FDIC on the grounds that the letter proved all administrative claims against the FDIC were then exhausted. The district court summarily denied the motion in its December 2, 2002, order.

This court reviews the denial of a Rule 60(b) motion for abuse of discretion. "In order to find an abuse of discretion, we must have 'a definite and firm conviction that the trial court committed a clear error of judgment.' Relief under Rule 60(b), moreover, is 'circumscribed by public policy favoring finality of judgments and termination of litigation.'" *Doe v. Lexington-Fayette Urban County Gov't*, 407 F.3d 755, 760 (6th Cir. 2005) (quoting *Davis v. Jellico Comm. Hosp., Inc.*, 912 F.2d 129, 133 (6th Cir. 1990) and *Waifersong Ltd. v. Classic Music Vending*, 976 F.2d 290, 292 (6th Cir. 1992)).

The FDIC was properly dismissed as a defendant for the reasons set forth, *supra*, in Section III.A. The exhaustion of Appellants' administrative claims is irrelevant to those determinations. The district court therefore did not abuse its discretion when it refused to reconsider its April 23, 2002, order and to reinstate Appellants' claims against the FDIC.

**C. <u>Substitution of the United States as a Defendant</u>**

In its order of April 23, 2002, the district court construed Appellants' Count III claims against the FDIC Employees to be "immutably torts in state common-law clothes," not federal

16

constitutional or statutory claims. Upon the Attorney General's subsequent certification that the

FDIC Employees were acting within the scope of their employment at the time of the incidents

giving rise to the suit, the district court dismissed the claims against the individuals and substituted

the United States in their place under 28 U.S.C. § 2679(d). It then reaffirmed the conclusion that

the claims were not constitutional in nature, and denied Appellants' motion for reconsideration of

its dismissal and substitution.

On appeal, Appellants do not challenge the district court's determination that the FDIC

Employees acted within the scope of their employment. Rather, their appeal is premised on their

assertion that the Count III claim, which alleges, *inter alia*, that the FDIC Employees injured

Appellants by "unconstitutionally discriminating against them" is in fact based on the United States

Constitution, and that substitution of the United States was therefore improper.[2] This court reviews

---

[2]Appellants never explicitly argued in their memoranda below that their Count III claim was a constitutional one. Citing *J.C. Wyckoff & Assoc., Inc. v. Standard Fire Ins. Co.*, 936 F.2d 1474 (6th Cir. 1991), the FDIC Employees and the United States argue that Appellants are now engaging in a forbidden attempt to raise on appeal an issue or argument not made in the lower court. However, we find that, by invoking the Constitution in their Complaint, Appellants presented the issue below. Moreover, in an attempt to raise the issue of qualified immunity, the FDIC Employees argued below that the claim was constitutional in nature, and the district court directly ruled that it was not.

The United States and the FDIC Employees also argue that because the Notice of Appeal specifically mentions only that portion of the district court's April 23, 2002, order dismissing the FDIC as an agency, the portion of that order holding that the claims against the FDIC Employees were state-law claims is not properly before this court, and that Appellants have waived review of the determination of the nature of their claims. However, Appellants did include in their Notice of Appeal the district court's August 22, 2002 order substituting the United States as defendant, as well as the final judgment of December 14, 2004. Because "an appeal from a final judgment draws into question all prior non-final rulings and orders," *McLaurin v. Fischer*, 768

questions of law *de novo*. *Coleman v. Mitchell*, 244 F.3d 533, 538 (6th Cir. 2001).

The Federal Tort Claims Act provides, in pertinent part:

> The remedy against the United States provided by [the FTCA] for injury or loss of property . . . arising or resulting from the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment is exclusive of any other civil action or proceeding for money damages by reason of the same subject matter against the employee . . . . Any other civil action or proceeding for money damages arising out of or relating to the same subject matter against the employee or the employee's estate is precluded . . . .

28 U.S.C. § 2679(b)(1). Where this section applies and the Attorney General certifies the employee acted within the scope of his employment, the claims against the employee are dismissed and the United States is substituted as defendant. 28 U.S.C. § 2679(d)(1). However, the absolute immunity of § 2679(b)(1) does not apply to claims for violations of the United States Constitution. 28 U.S.C. § 2679(b)(2)(A).

Count III alleges the FDIC Employees injured Appellants by "acting beyond their respective scopes of authority and employment by misrepresenting facts, being deceitful, violating their own policies, and unconstitutionally discriminating against the Plaintiffs." When construing claims under the FTCA, "courts must 'look beyond the literal meaning of the language to ascertain the real cause of complaint.'" *Fitch v. United States*, 513 F.2d 1013, 1015 (6th Cir. 1975) (quoting *Hall v. United States*, 274 F.2d 69, 71 (10th Cir. 1959)). Despite the label "unconstitutional discrimination," the district court found the actions complained of, i.e., misrepresenting facts, acting deceitfully, forcing

---

F.2d 98, 101 (6th Cir. 1985), the district court's conclusion that Count III contained only state-law claims is properly before this court.

18

a premature sale, and violating internal policies, could support only state common-law torts, not a

claim of "unconstitutional discrimination." Indeed, none of these actions indicate discrimination

of any kind, constitutional or otherwise: there is no allegation that Appellants were treated worse

than any other entities or class of entities. The same can be said for the additional Count III

allegations that the FDIC Employees "effectively" choose the purchaser of the Bank and

"effectively" banned Hughes from working for the purchaser.

Even if this court deemed Count III to contain a constitutional claim against the federal

agents, i.e., a *Bivens* claim, in addition to the state-law torts of misrepresentation and deceit, it would

affirm the district court's dismissal because the allegations are not specific enough to survive the

FDIC Employees' assertion of qualified immunity. In suits for damages, government officials are

entitled to qualified immunity unless they violate "a clearly established statutory or constitutional

right of which a reasonable public official . . . would have known." *Kennedy v. City of Cleveland*,

797 F.2d 297, 299 (6th Cir. 1986); *see also Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). As this

court explained in *Kennedy*:

> Where a defendant official is entitled to qualified immunity the plaintiff must plead
> facts which, if true, describe a violation of a clearly established statutory or
> constitutional right of which a reasonable public official, under an objective
> standard, would have known. The failure to so plead precludes a plaintiff from
> proceeding further, even from engaging in discovery, since the plaintiff has failed to
> allege acts that are outside the scope of the defendant's immunity.

*Kennedy*, 797 F.2d at 299; *see also Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) ("Unless the

plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading

qualified immunity is entitled to dismissal before the commencement of discovery.")

19

Appellants' allegation of "unconstitutional discrimination" and the accompanying factual assertions are insufficient to describe a violation of a clearly established constitutional right. Dismissal of any *Bivens* claim pled in Count III would therefore have been appropriate, leaving only state-law tort claims against the FDIC Employees. The district court's substitution of the United States in place of the FDIC Employees would have been proper in any event. 28 U.S.C. § 2679(b)(1). Under either construction of Appellants' Count III claims, therefore, the district court's action was proper. *Cf. United States v. Anderson County, Tenn.*, 761 F.2d 1169, 1174-75 (6th Cir.), *cert denied*, 474 U.S. 919 (1985) ("[A] reviewing court can sustain the judgment of a lower court on any ground that finds support in the record.").

## D. **Dismissal of the United States**

After it determined the United States was properly substituted in place of the FDIC Employees, the district court dismissed the claims against the United States, as well. The court found that the Count III claims were for misrepresentation and deceit, and that 28 U.S.C. § 2680(h) specifically exempted such claims from the United States' waiver of its sovereign immunity. On appeal, Appellants argue that § 2680(h) provides an exception only to the portion of the FTCA providing that an action under that Act is the exclusive remedy for torts committed by government employees. In other words, Appellants argue, the exception means claims for misrepresentation and deceit may be brought "outside the FTCA" against the FDIC Employees individually. Appellants believe this means the district court should not have dismissed the United States, as substituted for those individuals. As the district court dismissed Appellants' claims under Federal Rule of Civil

Procedure 12(b)(6), this court's standard of review is *de novo*. *Memphis Tenn. Area Local, Am. Postal Workers Union*, 361 F.3d at 902.

Title 28, United States Code, section 2680 provides, in pertinent part: "The provisions of this chapter [i.e., 28 U.S.C. § 2671 et seq.] and section 1346(b) of this title shall not apply to . . . . (h) Any claim arising out of . . . misrepresentation[ or] deceit." Section 2680 enumerates twelve other categories of claims to which the provisions of the FTCA do not apply.

Rather than providing exceptions merely to one portion of the FTCA, the thirteen enumerated exceptions in § 2680 apply to the Act's "broad waiver" of the United States' sovereign immunity. *Kosak v. United States*, 465 U.S. 848, 851-52 (1984). When one of the § 2680 exceptions applies:

> [T]he United States retains immunity from suit, [and] certification [under 29 U.S.C. § 2679 by the Attorney General that an individually-sued federal employee acted within the scope of his employment] disarms plaintiffs. They may not proceed against the United States, nor may they pursue the employee shielded by the certification.

*Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 427 (1995) (citation omitted).

Count III expressly alleges that the FDIC Employees engaged in misrepresentation and deceit. Moreover, even if the allegations in Count III that the FDIC Employees established unreasonable deadlines and unnecessary capital levels and conducted their duties in such a way as to prematurely force the Bank's sale were construed as a claim regarding the FDIC Employees' performance or failure to perform their discretionary functions, or a claim that they abused their discretion, the claim would fall under another exception to the United States' waiver of its sovereign

21

immunity, and dismissal would still be proper.  28 U.S.C. § 2680(a) (providing an exception for "[a]ny claim based upon . . . the exercise or performance or the failure to exercise or perform a discretionary function . . . whether or not the discretion involved be abused").  Therefore, the district court properly dismissed Appellants' claims against the United States.

**E.  Dismissal of the KDFI**

The district court dismissed Appellants' claims against the KDFI because it found they were barred by the doctrine of governmental immunity.  Appellants argue the dismissal was improper because the KDFI was not performing a governmental function, but was instead performing the "proprietary" function of "negligently training and/or supervising its employees" and "authorizing or ratifying the tortious activities of it[s] employees while they are 'on the job.'"  Once again, this court reviews *de novo*.  *Memphis Tenn. Area Local*, 361 F.3d at 902.

The district court's November 13, 2002, order analyzes the motion to dismiss the KDFI under a state doctrine of "governmental immunity" that shields the department from liability.  JA 50.  The district court relies on *Yanero v. Davis*, 65 S.W.3d 510 (Ky. 2002).  In its analysis, the district court uses the doctrine in this case to distinguish whether the KDFI performs either "governmental" or "proprietary" functions.  This analysis, based solely on state law, is in error.

Yanero has no applicability as to whether or not an action can proceed against the KDFI, an arm of the Commonwealth, in *federal* court.  The *Yanero* court correctly notes that sovereign immunity is a bar against suits proceeding against the state, and that only a waiver by the legislature can authorize a suit against the state.  The court then identifies the Kentucky statute effecting a

22

waiver of sovereign immunity:

> Thus, the Board of Claims Act enabled by the 1946 General Assembly and substantially amended to its present-day form by the 1950 General Assembly represents not a creation of immunity, but rather a limited waiver of immunity to the extent that immunity exists. It also designates where and when a claim can be asserted against the Commonwealth or against an otherwise immune agency, officer, or employee.

*Yanero v. Davis*, 65 S.W.3d 510, 524 (Ky. 2001) (footnotes omitted). However, this type of state-waiver has been considered previously by the United States Supreme Court. Their holding runs contrary to the logic reflected in the opinion of the district court:

> New York and New Jersey have expressly consented to suit in expansive terms. The statutory consent to suit provision, which provides that the States "consent to suits, actions, or proceedings of any form or nature at law, in equity or otherwise . . . against the Port of New York Authority," might be interpreted to encompass the States' consent to suit in federal court as well as state court. But such a broadly framed provision may also reflect only a State's consent to suit *in its own courts*. Sensitive to the values underlying the Eleventh Amendment, the Court has required that consent to suit in federal court be express and thus has construed such ambiguous and general consent to suit provisions, standing alone, as insufficient to waive Eleventh Amendment immunity. Other textual evidence of consent to suit in federal courts may resolve that ambiguity and sufficiently clearly establish the scope of the State's more general consent to suit.

*Port Auth. Trans-Hudson Corp. v. Feeney*, 495 U.S. 299, 306-07 (1990) (emphasis added) (citations omitted). Therefore, the district court was in error in relying on *Yanero*.

It is a fundamental principle of our federalism that the Eleventh Amendment bars suit against a state or one of its agencies in federal court without its consent. *Hans v. Louisiana*, 134 U.S. 1 (1890); *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98 (1984). If the KDFI must be dismissed from this case it is not on account of *Yanero*, but "because a state agency may not be sued

in federal court, regardless of the relief sought, unless the state has waived its sovereign immunity or Congress has overridden it." *Whittington v. Milby*, 928 F.2d 188, 193 (6th Cir. 1991) (citing *Alabama v. Pugh*, 438 U.S. 781, 782 (1978)).

The district court should instead have analyzed the issue of the KDFI's amenability to suit under our federal case law, specifically, *Ernst v. Rising*, 427 F.3d 351 (6th Cir. 2005) (en banc). In *Ernst* we recognized that immunity does not apply if the agency is a "political subdivision," like a county or municipality, but does apply if the agency is an "arm of the state." *Id*. at 358-59 (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977)). Further:

> In deciding whether an entity is an "arm of the State" on the one hand or a "political subdivision" on the other—the principal issue that occupies us today—the Supreme Court has considered several factors: (1) the State's potential liability for a judgment against the entity; (2) the language by which state statutes, and state courts, refer to the entity and the degree of state control and veto power over the entity's actions; (3) whether state or local officials appoint the board members of the entity; and (4) whether the entity's functions fall within the traditional purview of state or local government. In discussing these factors, the Court has emphasized that the first factor—the liability of the State for a judgment—is the foremost factor, and that it is the state treasury's potential legal liability for the judgment, not whether the state treasury will pay for the judgment in *that* case, that controls the inquiry . . . .

*Id*. at 39 (citations omitted).

Although the district court's analysis was in error, a de novo review reveals that the error was harmless. *See generally Beck v. Haik*, 377 F.3d 624, 634-35 (6th Cir. 2004). Under the test enunciated in *Ernst*, the KDFI is clearly an arm of the state. Its existence is confirmed as an "administrative organization" in the Kentucky Statutes. *See* K.R.S. § 12.010 (describing the KDFI as a "basic unit of administrative organization of state government," and part of "the executive

branch of the state government").

## F. <u>Summary Judgment in Favor of the KDFI Employees</u>

Count III accuses the KDFI Employees of: (1) misrepresenting facts, being deceitful, violating the KDFI's policies, and unconstitutionally discriminating against Appellants; (2) prematurely forcing Appellants to sell the Bank; (3) not allowing Appellants to obtain a fair price for the Bank; (4) "effectively" choosing the buyer of the Bank; and (5) "effectively" banning Appellant Hughes from working for the Bank's purchaser or for anyone else in the banking business.

The KDFI Employees raised the defense of state qualified immunity. On the Employees' motion to dismiss, the district court concluded that the Employees performed discretionary functions and acted within the scope of their employment, but determined that discovery was required on the issue of whether the Employees acted in bad faith. After the discovery period concluded without Appellants taking any discovery, the district court granted the Employees' motion for summary judgment, finding: "[o]ther than Plaintiff Hughes' own conclusory statements . . . Plaintiffs have not directed the Court's attention to any documentary evidence or other testimony in support of his allegations of bad faith against the KDFI employee defendants." Appellants seek review of this determination. This court reviews the district court's grant of summary judgment *de novo*. *United States v. Dairy Farmers of Am., Inc.*, 426 F.3d 850, 856 (6th Cir. 2005).

As this court has explained:

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." We must consider the factual evidence and draw

25

all reasonable inferences in favor of the non-moving party. A genuine issue of material fact exists when there is sufficient evidence for a trier of fact to find for the non-moving party. A "mere scintilla" of evidence will not be enough for the non-moving party to withstand summary judgment.

*Id*. at 856-57 (quoting Fed. R. Civ. P. 56(c)) (internal citations omitted). "In order to survive a motion for summary judgment, the non-moving party must be able to show sufficient probative evidence [that] would permit a finding in [his] favor on more than mere speculation, conjecture, or fantasy." *Lewis v. Philip Morris, Inc.*, 355 F.3d 515, 533 (6th Cir. 2004) (internal quotations omitted). Affidavits submitted in support of or in opposition to a motion for summary judgment, "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed. R. Civ. P. 56(e). Finally, "[h]earsay evidence may not be considered on summary judgment." *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 927 (6th Cir. 1999).

In Kentucky, "[q]ualified official immunity applies to the negligent performance by a public officer or employee of (1) discretionary acts or functions *i.e.*, those involving the exercise of discretion and judgment, or personal deliberation, decision, and judgment; (2) in good faith; and (3) within the scope of the employee's authority." *Yanero v. Davis*, 65 S.W.3d 510, 522 (Ky. 2001) (citations omitted). As the *Yanero* court explained:

[I]n the context of qualified official immunity, "bad faith" can be predicated on a violation of a constitutional, statutory, or other clearly established right which a person in the public employee's position presumptively would have known was afforded to a person in the plaintiff's position i.e., objective unreasonableness; or if the officer or employee willfully or maliciously intended to harm the plaintiff or acted with a corrupt motive. Once the officer or employee has shown *prima facie* that the act was performed within the scope of his/her discretionary authority, the

26

burden shifts to the plaintiff to establish by direct or circumstantial evidence that the discretionary act was not performed in good faith.

*Id.* at 523 (internal citation omitted).

The district court properly determined that the acts Appellants complain of, including investigating the Bank's capitalization levels and bond portfolio, development of remedial measures, and setting dates for liquidation, were discretionary functions that fell within the KDFI Employees' scope of employment. Appellants have presented no evidence that any of the KDFI Employees acted wilfully or intentionally to injure Appellants (i.e., that they acted any way other than negligently), or acted in "bad faith."

Appellants responded to the Defendants' properly supported motion for summary judgment with quotations from a previous brief's factual statement, which Appellant Hughes had incorporated by reference into his sworn affidavit, and from Hughes' deposition testimony. None of the quoted material amounts to evidence of a type a jury could rely upon to find in Appellants' favor. The averments and testimony all fall into one or more of the following categories: conclusory allegations; unfounded conjecture; hearsay statements; statements demonstrating a lack of personal knowledge; statements not capable of supporting a finding of wilfulness, intent, or bad faith; and statements failing to link any of the individual Defendants to the alleged wrongdoing. In short, the district court correctly granted summary judgment in favor of the KDFI Employees because Appellants failed to present evidence sufficient to create a genuine issue of material fact. While Appellants no doubt believe their allegations, conjectures, and impressions to be true, they must produce admissible evidence in order to survive summary judgment, and have failed to meet this

burden.  The district court's grant of summary judgment was proper.

### G.  <u>Rule 60(b) and the Agreement to Arbitrate</u>

For the first time on appeal, Appellants argue that the contract containing the arbitration

clause between the Bank and APS (and its employee, Mastroleo) "should now be declared invalid

and unenforceable due to fraud (in the inducement), misrepresentation or other misconduct . . . ."

Appellants mistakenly argue that Federal Rule of Civil Procedure 60(b) "should now be applied to

the facts of this case," and that newly discovered evidence of fraud requires this court to declare the

contract invalid.   To the extent Appellants are seeking "review" of the motion compelling

arbitration, "[t]his Court reviews *de novo* a district court's decisions regarding both the existence

of a valid arbitration agreement and the arbitrability of a particular dispute."   *Walker v. Ryan's*

*Family Steak Houses, Inc.*, 400 F.3d 370, 376 (6th Cir. 2005).

The Federal Rules of Civil Procedure govern procedure in the United States district courts,

not in the courts of appeal.  *See* Fed. R. Civ. P. 1.  Appellants did not make a Rule 60(b) motion

below regarding the portion of the district court's April 22, 2002 order granting the motion to

compel arbitration, and they may not invoke that rule in this court.

Even if Rule 60(b) somehow did apply, Appellants' Rule 60(b) motion, which relies on

subsections (1), (2), and (3) of that rule, would be untimely because it was filed more than one year

after the district court issued the order compelling arbitration.  *See* Fed. R. Civ. P. 60(b).  Moreover,

Appellants' "newly discovered" evidence (the "facts" that brokers other than APS routinely inquire

about their clients' investment objectives and risk tolerance, which APS did not, and that APS held

28

itself out to others as an expert in dealing with low-cost, risky, defaulted securities) would not entitle them to relief under Rule 60(b) in any event, because they have failed to show they exercised due diligence to try to obtain the information before the district court ruled. *See Good v. Ohio Edison Co.*, 149 F.3d 413, 423 (6th Cir. 1998).

Moreover, Appellants failed to argue below, either in response to the motion to compel arbitration or in a motion for reconsideration, that they were fraudulently induced to enter into the contract containing the arbitration clause. "Issues not presented to the district court but raised for the first time on appeal are not properly before [this] court." *J.C. Wyckoff & Assoc., Inc. v. Standard Fire Ins. Co.*, 936 F.2d 1474, 1488 (6th Cir. 1991). Therefore, and because this court may not provide the Rule 60(b) relief Appellants request, we affirm the district court's order compelling arbitration.

**H. Dismissal of David Scott for Failure to Prosecute**

By October 3, 2002, Appellants' only remaining claim was their Count V claim against the Bank's former CFO, David Scott. The district court ordered the parties to file a status report on their progress by October 17, 2003. Scott reported that Appellants had taken no discovery, and asked the district court to hold the claims against him in abeyance pending the outcome of the arbitration between Appellants and APS, or for trial to be continued until discovery could be taken. Appellants did not file a status report.

On November 7, 2003, more than two years after the complaint was filed, the district court ordered Appellants to show cause why the claims against Scott should not be dismissed for failure

to prosecute. Appellants responded by asking that the claims be held in abeyance pending the arbitration, as their claims against Scott, APS, and Mastroleo were related. The district court, on November 18, 2003, issued an order holding the claims against Scott in abeyance until the conclusion of the arbitration proceedings, and requiring a status report within ten days of their conclusion. Until such time, the district court struck the case from its active docket.

A year elapsed during which Appellants did not initiate arbitration proceedings against APS and Mastroleo. On November 12, 2004, Scott moved to dismiss for failure to prosecute. Appellants responded that they had been unable to obtain counsel to initiate the arbitration proceedings and had experienced difficulty obtaining necessary documents from Central Bancshares. Appellants informed the court that Appellant Hughes was presently preparing an arbitration complaint, and that they "may be forced" to initiate litigation against Central Bancshares if the latter did not provide the requested documents. On December 14, 2004, the district court granted Scott's motion and dismissed Appellants' claim against Scott for failure to prosecute.

On appeal, Appellants argue that the district court acted improperly when it dismissed their claims against Scott, because the court had set no deadlines within which to comply with its order to arbitrate, and because the court had removed the case from its active docket until the parties filed a post-arbitration status report. This court reviews a dismissal under Rule 41(b) for abuse of discretion. *Knoll v. AT&T*, 176 F.3d 359, 363 (6th Cir. 1999). The court will reverse the dismissal only upon "a definite and firm conviction that the trial court committed a clear error of judgment." *Id*.

Rule 41(b) allows district courts to dismiss a claim "[f]or failure of the plaintiff to prosecute." Fed. R. Civ. P. 41(b). "This measure is available to the district court as a tool to effect 'management of its docket and avoidance of unnecessary burdens on the tax-supported courts [and] opposing parties.'" *Knoll*, 176 F.3d at 363 (quoting *Mulvaney v. Rivair Flying Serv., Inc. (In re Baker)*, 744 F.2d 1438, 1441 (10th Cir. 1984)). As this court explained in *Knoll*:

> In the context of dismissal pursuant to Rule 41(b) for failure to prosecute, we look to four factors for guidance: (1) whether the party's failure is due to willfulness, bad faith, or fault; (2) whether the adversary was prejudiced by the dismissed party's conduct; (3) whether the dismissed party was warned that failure to cooperate could lead to dismissal; and (4) whether less drastic sanctions were imposed or considered before dismissal was ordered.

*Id*. at 363 (citation omitted). "Although typically none of the factors is outcome dispositive, it is said that a case is properly dismissed by the district court where there is a clear record of delay or contumacious conduct." *Id*.

Here, the district court was faced with a clear record of delay. Appellants failed to file a status report when ordered to in October of 2003, after the district court had dismissed all but one defendant. In November of 2003, when the district court ordered the case held in abeyance pending arbitration, two years had elapsed without any discovery being taken against Scott. One year after that, and over two-and-a-half years after the court granted APS's motion to compel arbitration in April of 2002, Appellants had failed to initiate arbitration proceedings. By that time, the claims against Scott had been pending with no action taken for over three years.

Looking to the fault of the dilatory Plaintiffs, Appellants argue their delay is explained by their failure to obtain arbitration counsel and to obtain documents from a third party, Central

Bancshares. While Appellants have explained what they failed to do, they have not explained why they failed to do it. That is to say, they provide no explanation why, in the two-and-a-half years following the district court's order to arbitrate, they failed to either obtain counsel or to file a complaint in arbitration drafted by Attorney Hughes, and failed to initiate litigation to obtain the necessary documents, as they indicated they were considering in late 2004. Remedies for Appellants' stated problems were readily available to them; however, Appellants failed to use them.

Prejudice to David Scott is clear. This case has been pending against him for over three years and has impeded his quest for a home mortgage and a securities registration.

Finally, Appellants should have been put on notice by the district court's November, 2003, show-cause order that failure to advance the litigation with promptness could lead to dismissal for failure to prosecute. While the record does not indicate whether the district court considered alternative sanctions, the clear record of delay, the prejudice to Scott, and the prior show-cause order indicate that the district court did not abuse its discretion in dismissing for failure to prosecute.

This is so despite the fact that the litigation had been stricken from the active docket, which the district court no doubt did for administrative purposes. First, Appellants cite to no cases holding that a Rule 41(b) dismissal under such circumstances is inappropriate. Moreover, the claims against Scott had been held in abeyance in part at Appellants' request, to allow them to pursue arbitration. At that point, the ball was in Appellants' court, and they held it for a year without doing anything, when they had the power to act. The district court's failure to give a deadline for initiating arbitration should not be construed to sanction a two-and-a-half year delay. Under the

32

circumstances of this case, it does not appear that the district court made a clear error of judgment.

The district court did not abuse its discretion when it dismissed Appellants' claims against Scott for

failure to prosecute.

## IV.  <u>Conclusion</u>

For the foregoing reasons, we AFFIRM the rulings and the judgment of the district court.